UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DEWAYNE TAYLOR,

                            Petitioner,

      -against-

UNITED STATES OF AMERICA,

                            Respondent.
------------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUN 2 3 2015 ★
BROOKLYN OFFICE

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
12-CV-04904 (CBA)

**AMON, Chief United States District Judge:**

Dewayne Taylor, proceeding pro se, has petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2255. Taylor was convicted, following a jury trial, of one count of conspiracy to distribute cocaine base, in violation of 21 U.S.C. §§ 846 & 841(b)(1)(A), and sentenced principally to 270 months' imprisonment. For the reasons that follow, the Court denies Taylor's petition for habeas relief in its entirety.

## BACKGROUND

### I. The Trial

The following facts were presented at Taylor's June 2009 trial. On November 16, 2008, acting on a tip from a confidential informant, Agent Steve Hammonds and two other Kingsport, Tennessee law enforcement officers staked out the Kingsport Greyhound bus station. (Trial Transcript ("Tr.") 32-33.) The confidential informant had told Hammonds that an African-American male carrying a single bag would arrive that morning on a bus from Detroit in order to deliver oxycontin to Tennessee drug dealers. (Tr. 67-69.) At approximately 2:15 p.m., a bus arrived at the station and dropped off approximately six to eight people. (Tr. 33.) Each person was picked up or left the station within minutes, save for a single African-American man—later

1

identified as Darien Pughe—who waited by the station and placed several phone calls. (Tr. 33-34.) Approximately ten minutes after Pughe arrived, an "aggressively" driving Ford Expedition pulled up to the station. Pughe got into the vehicle and it drove away. (Tr. 34-35.) Hammonds and the two other officers—each of whom was in an unmarked car in the vicinity of the bus station—proceeded to follow the Expedition as it drove through downtown Kingsport. (Tr. 35-41.) Eventually, the Expedition was stopped by the officers as it pulled into a narrow alleyway. (Tr. 40-41.)

As Hammonds approached the Expedition from the front, he observed three occupants of the vehicle: Pughe, seated in the back seat; a woman seated in the front passenger seat, later identified as Jessie Wright; and the driver, later identified as Taylor, the petitioner in this case. (Tr. 50-51.) Hammonds testified that as he approached the car, it looked as though Wright was frantically moving her hands below the windshield, as if she was attempting to conceal something. (Tr. 50.) Hammonds approached the driver side window and asked Taylor for identification. (Tr. 52.) Taylor retrieved from somewhere in the car a woman's bag and produced identification from it. (Id.) Hammonds then asked Taylor to exit the Expedition and directed him to the back of the vehicle to speak with another agent. (Tr. 53.)

After Taylor left the vehicle, Hammonds turned his attention to Wright and Pughe. (Tr. 53.) As Hammonds spoke to them, he made two significant observations. He observed a box of sandwich baggies on the rear seat next to Pughe's luggage. (Tr. 54-55.) He further noticed that the vehicle's glove compartment was open and appeared to contain two sandwich baggies full of crack cocaine. (Id.) Hammonds questioned Wright about the substance in the glove compartment and directed her out of the car, and then spoke with Pughe, who consented to a search of his person and his bag. (Tr. 55-57) Hammonds found a razor blade in Pughe's pocket

2

(Tr. 57), but testified that he did not find anything suspicious in Pughe's bag (Tr. 80). However, Hammonds testified that when he later examined the bag, he detected a faint odor of cocaine on a pair of socks in the bag. (Tr. 59-60.)

The agents subsequently received Taylor's consent to search the Expedition. (Tr. 57-58.) The search recovered the two bags of crack cocaine in the glove compartment, and a digital scale that was located on the console. (Tr. 58-59.) All three of the vehicle's occupants were placed under arrest. When the two bags in the glove compartment were later tested, they were determined to contain 29.6 grams of crack cocaine. (Tr. 357.) The officers later found a third bag of crack cocaine on Wright's person which contained 92.8 grams of crack cocaine. (Tr. 153, 347.)

In addition to testimony from the officers regarding the circumstances under which Taylor was arrested, the government at trial also introduced testimony from a cooperating witness, Linsey Hyatt. Hyatt was a former girlfriend of Taylor's, and testified at length about her involvement in and knowledge of Taylor's crack cocaine distribution conspiracy. Hyatt testified that she first met Taylor in 2006, and from early 2006 through August 2006, she was involved in Taylor's daily crack cocaine distribution. She testified that Taylor was selling the drug nearly every day during that time period (Tr. 184), and that either Taylor or Vic, a coconspirator, would travel to New York City on a weekly basis to pick up powdered cocaine and transport it to Kingsport. (Tr. 188-90.) The powdered cocaine was packed in gallon bags, and Taylor would cook it into crack cocaine in Tennessee. (Tr. 191-92.) After cooking it, Taylor would package the crack cocaine for sale in sandwich bags. Each bag contained between half and three grams of crack cocaine. (Tr. 193.)

Hyatt was also personally involved in the drug operation in 2006. She testified that she went to New York with Taylor on two or three occasions, and that on each of those trips Taylor purchased at least half a kilogram of cocaine. (Tr. 195-97.) On another occasion, when Taylor was arrested on an outstanding warrant on his way back from New York, he instructed her to retrieve a nearly full gallon bag of powder cocaine from his impounded vehicle. (Tr. 201-03.) She also helped package drugs in Tennessee approximately five times, and testified that she would assist Taylor by picking money up from him while he was selling—usually between $3,000 and $4,000 each day. (Tr. 194, 199-200.) She further testified that on one particular occasion, early in her time with Taylor, she observed three or four kilograms of crack cocaine drying on a heater in the hotel room in which they were staying. (Tr. 182-83.)

In approximately August 2006, Taylor went to prison for about eighteen months. (Tr. 321.) Hyatt began to see him again upon his return to Kingsport in February 2008. She testified that in 2008, Taylor began travelling to New York to get drugs again, albeit in smaller quantities than previously. (Tr. 211.) Furthermore, Hyatt testified that on one occasion, a man whom she did not know arrived on a bus from New York with crack cocaine and distributed the drugs along with Taylor and Vic. (Tr. 212-17.) Hyatt witnessed Taylor with crack cocaine on at least one occasion between September 2008 and Taylor's arrest (see Tr. 221-25), and Taylor discussed his crack cocaine operations with her several times, including describing one incident in which he had left a hotel room immediately before police had arrived, discovered crack cocaine, and arrested two of Taylor's associates. (Tr. 226.)

## II. The Verdict and Sentencing

After a two-day trial, the jury found Taylor guilty of the single charged count of conspiracy to distribute cocaine base, in violation of 21 U.S.C. §§ 846 & 841(b)(1)(A), but

4

acquitted Pughe of that same charge.[1] Because the government had filed a prior felony information against Taylor (see Docket Entry ("D.E.") 34), that conviction subjected him to a minimum prison term of twenty years and a maximum prison term of life.

In Taylor's Presentence Investigation Report ("PSR"), the Probation Department, after accepting objections by the government to the initial version of the PSR, recommended finding an offense level of 44 and a criminal history category of VI. The PSR calculated a base offense level of 38, holding Taylor accountable for 13.36 grams of oxycodone[2] and 28 kilograms of cocaine base. The PSR recommended enhancing the offense level by four points due to Taylor's leadership role, pursuant to U.S.S.G. § 3B1.1(a), and two points for obstruction of justice pursuant to U.S.S.G. § 3C1.1, resulting in an offense level of 44. The criminal history category of VI was based on a recommendation that Taylor be found to be a career offender pursuant to U.S.S.G. § 4B1.1 as a result of prior North Carolina state and Tennessee federal drug convictions. Based on the offense level of 44 and criminal history category of VI, Taylor's Guidelines range was life imprisonment.

Taylor raised several objections in writing to the PSR's Guidelines calculation. (See D.E. 97.) First, Taylor contended that the career offender designation was incorrect because there was insufficient proof of the North Carolina narcotics conviction. Second, he challenged the base offense level of 38, arguing that he should only be held responsible for the crack cocaine recovered when he was arrested, and not for additional amounts based on Hyatt's testimony regarding his drug activity. Finally, he challenged both the leadership role and obstruction of justice enhancements.

---

[1] Wright was convicted of conspiracy to distribute cocaine base at a separate trial.
[2] The oxycodone was recovered from Wright's bag, from which Taylor had retrieved his wallet during the traffic stop. (PSR ¶ 10.)

5

At sentencing, the Court rejected Taylor's first two challenges to the Guidelines calculation, determining that the North Carolina conviction was adequately documented and thus that the career offender enhancement applied, and that the PSR's inclusion of drug quantities testified to by Hyatt was proper in determining the base offense level. (Sentencing Transcript ("Sentencing Tr.") 13, 15.) The Court also rejected Taylor's objection to the obstruction of justice enhancement; however, it agreed with him that the leadership role enhancement was not proper and declined to apply that enhancement. (Sentencing Tr. 13-14.) The Court therefore determined that Taylor's total offense level was 40, basing it on his responsibility for more than 4.5 kilograms of cocaine base, as well as the obstruction of justice enhancement, and that his criminal history category was VI, resulting in a Guidelines range of 360 months' to life imprisonment. (Sentencing Tr. 15-17.) After consideration of the sentencing factors of 18 U.S.C. § 3553(a), the Court sentenced Taylor principally to 270 months' imprisonment.

## III. Direct Appeal

Taylor appealed his conviction to the United States Court of Appeals for the Second Circuit, raising two arguments. First, joining an argument made by Wright in appeal from her conviction, he argued that the Court erred in failing to suppress Hammonds's warrantless search of the glove compartment. Second, he argued that the government failed to meet its burden of proving that venue was proper in this Court. In a Summary Order dated September 29, 2011, the Second Circuit rejected the first argument on the merits, and found that Taylor had failed to preserve the venue challenge for appellate review. See United States v. Pughe, 441 F. App'x 776, 777-78 (2d Cir. 2011). The court went on to note that, "[e]ven if Taylor had preserved his venue objection for appellate review, it would still be proper to affirm his conviction," because notwithstanding Pughe's acquittal, the evidence was sufficient for the jury to find by a

preponderance of the evidence that Pughe was involved in the conspiracy and committed acts in furtherance of the conspiracy within the Eastern District of New York. Id. at 779. The Second Circuit therefore affirmed Taylor's conviction, and its mandate issued on October 20, 2011. (D.E. 134.)[3]

## THE PETITION

Taylor filed this habeas petition on September 28, 2012, raising eight issues. First, he largely reiterates his venue objection raised on direct appeal, arguing that venue was improper and this Court therefore lacked subject matter jurisdiction over his case. Each of Taylor's other claims is premised on the ineffectiveness of his trial counsel, Len Kamdang, or of his counsel at sentencing and on appeal, Lucas Andino. He argues that those attorneys were ineffective in (1) failing to raise a challenge to venue; (2) failing to negotiate a plea agreement with the government; (3) failing to object at sentencing to the inclusion of drug quantities based on Hyatt's testimony in calculating his offense level; (4) failing to object to the addition of certain criminal history points; (5) stating in the reply brief on appeal that Pughe's involvement was the "sine qua non" of venue in the case; (6) failing to challenge on appeal the inclusion of his North Carolina conviction in determining that he was a career offender; and (7) failing to raise certain Guidelines provisions relevant to calculating criminal history points. The government responded to Taylor's petition on April 1, 2013, and, on April 22, 2013, Taylor filed a reply.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2255, a federal prisoner can obtain post-conviction relief where his sentence: "(1) was imposed in violation of the U.S. Constitution or the laws of the United

---

[3] On November 18, 2011, this Court sua sponte ordered the government to show cause why Taylor should not be resentenced pursuant to the November 2011 amendments to the United States Sentencing Guidelines regarding crack cocaine offenses. (D.E. 135.) The Court subsequently ruled that Taylor was not entitled to be resentenced as the amendment did not affect his Guidelines range, (see D.E. 141), a decision later affirmed by the Second Circuit, see United States v. Taylor, 531 F. App'x 111, 113 (2d Cir. 2013).

7

States; or (2) was entered by a court without jurisdiction to impose the sentence; or (3) exceeded the maximum detention authorized by law; or (4) is otherwise subject to collateral attack." Adams v. United States, 372 F.3d 132, 134 (2d Cir. 2004). "[S]ection 2255 may not be employed to relitigate questions which were raised and considered on direct appeal." Cabrera v. United States, 972 F.2d 23, 25 (2d Cir. 1992) (internal quotation marks omitted). Issues not raised on direct appeal will be deemed procedurally defaulted and unreviewable through a § 2255 petition absent cause and prejudice or a demonstration of actual innocence. See Bousley v. United States, 523 U.S. 614, 622 (1998). Nonetheless, "an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." Massaro v. United States, 538 U.S. 500, 504 (2003).

## DISCUSSION

### I. Taylor's Venue Challenge

Taylor first argues that this Court lacked subject matter jurisdiction over his criminal case because the government failed to establish that venue was proper in the Eastern District of New York. According to Taylor, the failure to establish venue deprived the Court of subject matter jurisdiction and, because a challenge to subject matter jurisdiction is not waivable, the Court should have sua sponte dismissed the case despite his trial counsel's failure to raise the issue.

Taylor's challenge to venue is procedurally barred, as that exact issue was raised in his direct appeal to the Second Circuit and rejected by that court. And even if the claim was not procedurally barred, Taylor's contentions are meritless. Venue is not jurisdictional and can be waived. See United States v. Calderon, 243 F.3d 587, 590 (2d Cir. 2001). The Court therefore rejects Taylor's claim that he is entitled to habeas relief because venue was improper.

8

## II. Ineffective Assistance of Counsel

Unlike other claims, a claim of ineffective assistance of counsel is not procedurally barred by a petitioner's failure to raise it on direct appeal of his conviction. See Massaro, 538 U.S. at 504. "To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." United States v. Pitcher, 559 F.3d 120, 123 (2d Cir. 2009) (citing Strickland v. Washington, 466 U.S. 668, 694 (1984)). The same standard applies in assessing the effectiveness of appellate counsel. See Claudio v. Scully, 982 F.2d 798, 803 (2d Cir. 1992). "'The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error.'" Pitcher, 559 F.3d at 123 (quoting Kimmelman v. Morrison, 477 U.S. 365, 381 (1986)). In analyzing counsel's alleged deficiency, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. Because "[t]here are countless ways to provide effective assistance in any given case," id., the lack of success of a chosen strategy should not cause a court to second-guess an attorney's judgments, see Cuevas v. Henderson, 801 F.2d 586, 590 (2d Cir. 1986).

### A. Failure to Object to Venue

Taylor argues that his trial counsel was ineffective in failing to explicitly challenge whether venue was proper in the Eastern District of New York. Contrary to Taylor's claims, however, Kamdang explicitly raised the issue of venue with the Court (Tr. 397), and procured from the Court a charge instructing the jury that, in addition to the elements of the conspiracy crime, it must "decide whether any act in furtherance of the crimes charged occurred within the

Eastern District of New York" (Tr. 461). The issue of venue was thus explicitly placed before the jury, which determined by a preponderance of evidence that venue was proper.

To the extent that Taylor faults Kamdang for failing to explicitly raise venue as a basis for the Rule 29 motion for acquittal, he cannot demonstrate that counsel was ineffective. Even if Kamdang should have explicitly raised that issue, Taylor suffered no prejudice, as the Second Circuit concluded on direct appeal that the evidence was sufficient to allow the jury to find that venue was proper. See Pughe, 441 F. App'x at 779.

### B. Failure to Negotiate a Plea Deal

Taylor next claims that Kamdang rendered ineffective assistance by failing to negotiate a plea agreement. Taylor alleges that Kamdang informed him "that the government was seeking a plea in the range of 15 years," and that in response he told Kamdang that he "would like to have this done before the government decides to file any 'prior felony information,'" which would have subjected him to a mandatory minimum sentence of 20 years. (Petition at 19.) Kamdang subsequently failed to "inform [Taylor] as to whether he made any progress . . . surrounding the 15 year negotiation," and, "[a]s a result of [Kamdang's] procrastination," the government filed the prior felony information. (Id. at 19-20.) Taylor argues that the failure to negotiate the discussed plea bargain in a timely fashion constituted ineffective assistance of counsel.

A defendant's Sixth Amendment right to counsel "extends to the plea-bargaining process." Lafler v. Cooper, 132 S. Ct. 1376, 1384 (2012). "[T]he same two-part standard" established by Strickland is "applicable to ineffective-assistance claims arising out of the plea process." Hill v. Lockhart, 474 U.S. 52, 57 (1985). Thus, to obtain such relief, a petitioner must first demonstrate that counsel's representation fell below an objective standard of reasonableness. See Strickland, 466 U.S. at 687-88. Second, in order to establish Strickland

prejudice, a petitioner who argues that his counsel's ineffectiveness caused him not to accept a plea offer must show

> a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

Lafler, 132 S. Ct at 1385. Although counsel's failure to pursue a plea bargain may, in some instances, constitute ineffective assistance of counsel, cf. Missouri v. Frye, 132 S. Ct. 1399, 1408 (2012) (failure of counsel to communicate prosecution's plea offer to defendant constituted deficient performance), the failure to obtain a plea bargain cannot constitute ineffective assistance of counsel "when the record does not contain evidence that one might have been offered," Eisemann v. Herbert, 401 F.3d 102, 109 (2d Cir. 2005); see also Burger v. Kemp, 483 U.S. 776, 785 (1987) (finding that failure to obtain plea bargain was not evidence of ineffective assistance of counsel because "[t]he notion that the prosecutor would have been receptive to a plea bargain is completely unsupported in the record").

There is no basis for this Court to conclude that Taylor received ineffective assistance of counsel with regard to plea negotiations, as there is no evidence that a formal plea deal was ever offered by the government. Taylor suggests repeatedly that Kamdang told him that the government "was seeking a plea in the range of 15 years." (Petition at 19.) However, he never claims that any such deal was actually offered. To the contrary, the government asserts that no plea offer was ever extended, and that it informed Kamdang that it did not intend to extend one. (Affidavit of Matthew S. Amatruda ¶¶ 3, 5.) The government acknowledges that it asked Kamdang to explore the possibility of Taylor's cooperation. (Id. ¶ 3.) However, it maintains that it never made a plea offer in conjunction with or independently of a cooperation agreement and,

11

in any event, asserts that Kamdang told prosecutors that Taylor "vehemently rejected the idea" of cooperating. (Id. ¶¶ 3, 5.) Nor does Taylor suggest anywhere that he would have been open to the possibility of cooperating with the government. Without any evidence that the government was in fact amenable to engaging in plea discussions with Taylor, his trial counsel was not ineffective in failing to obtain a plea agreement for him.

### C. Failure to Challenge Drug Weight Attributable to Taylor

Taylor also argues that Andino was ineffective for failing to challenge the Court's assessment of the drug weight attributable to him in calculating his Guidelines range. The Court found that, in addition to 122.4 grams of cocaine base seized when he was arrested in Kingsport, Taylor was also responsible for more than 4.5 kilograms of cocaine base, based on the testimony of cooperating witness Linsey Hyatt. (Sentencing Tr. 13.) Taylor alleges that Andino failed to challenge the inclusion of that additional amount of crack cocaine, and suggests that the failure to do so rendered his assistance ineffective.

This claim fails because Andino explicitly challenged the inclusion of the additional drug quantity based on Hyatt's testimony. Taylor's PSR initially recommended that he be held responsible for only the 122.4 grams of cocaine base seized when he was arrested. (PSR ¶ 14.) The government objected to that calculation and argued that, based on Hyatt's testimony, he should be held responsible for 17 or 24 kilograms of cocaine base. (See D.E. 82 at 3.) In his written sentencing submissions, Andino objected to including that increased weight, arguing that it was both legally and factually improper (see D.E. 97 at 3-4), arguments that he reiterated at length during oral argument prior to sentencing (see D.E. 122 at 20-22 (arguing that the estimates of drug quantities based on Hyatt's testimony should be discounted)). Given that the

objection was raised, Taylor's claim that Andino was ineffective for failing to challenge the drug quantity is meritless.

Furthermore, even if Andino had failed to challenge the inclusion of drug quantities based on Hyatt's testimony, such failure would not constitute ineffective assistance of counsel. A court may determine sentencing factors by a preponderance of the evidence, and may consider uncharged conduct or conduct of which a defendant was acquitted in fashioning a sentence within the statutory sentencing range. United States v. Vaughn, 430 F.3d 518, 525-27 (2d Cir. 2005). During sentencing in this case, the Court credited Hyatt's testimony, finding that her account of Taylor's crack cocaine transactions in 2006 and 2008 established that Taylor was responsible for "clearly more than 4.5 kilograms of cocaine base," enough to raise the Guidelines calculation to the top base level of 38. (Sentencing Tr. 13.) As consideration of that additional drug quantity was legally proper, and Taylor raises no argument that it was factually improper, Taylor was not prejudiced by any alleged failure of his counsel to raise that issue.

Finally, Taylor's petition suggests that he also takes issue with his counsel's decision to stipulate during trial to the amount of drugs actually recovered when he was arrested. (See Petition at 24 (suggesting that it was "because of the . . . stipulation . . . that . . . the jury [found him] guilty" of conspiring to distribute more than fifty grams of cocaine base).) However, "counsel's decision to stipulate to certain evidence, like his decisions to offer or object to evidence, involves a strategic choice, which is 'virtually unchallengeable' if made after thorough investigation." United States v. Gaskin, 364 F.3d 438, 468 (2d Cir. 2004) (quoting Strickland, 466 U.S. at 690-91). There is no indication from the record that the decision to stipulate to the amount of narcotics was unreasonable, particularly given that Taylor's defense at trial was not that the charged amount was incorrect, but instead that he was unaware of the presence of the

13

drugs in the car or that the drugs belonged to somebody else. Nor is there evidence that Taylor was prejudiced by the decision to stipulate to the weight of the drugs, as there is no reason to believe that the government would have been unable to prove that the weight of the seized crack cocaine was the stipulated amount of 122.4 grams.

### D. Failure to Challenge Criminal History Enhancement

Taylor argues that his counsel at sentencing was ineffective for failing to object to the addition of two criminal history points pursuant to the then-effective U.S.S.G. § 4A1.1(e), arguing that because two points were added pursuant to § 4A1.1(d) due to his commission of the instant offense while on supervised release, only one point should have been added pursuant to § 4A1.1(e)'s recent crime provision.[4] Taylor is correct that only one point may be added pursuant to § 4A1.1(e) when two points have already been added under § 4A1.1(d). That is why the PSR only recommended adding one point pursuant to § 4A1.1(e) for that very reason. There was therefore no basis for his attorney to object to the PSR's use of § 4A1.1(e). (PSR ¶¶ 68-69.) Furthermore, even if the PSR's calculation was somehow inaccurate, any such inaccuracy was immaterial. The Court found that Taylor was subject to the career offender enhancement (see Sentencing Tr. 15), and thus that his criminal history category was automatically VI, see U.S.S.G. § 4B1.1(b). The § 4A1.1(e) enhancement was therefore entirely irrelevant to the calculation of Taylor's Guidelines range.

### E. Appellate Counsel's Statement That Pughe's Involvement Was the "Sine Qua Non" of Venue

Taylor faults his appellate counsel for acknowledging in a brief filed before the Second Circuit that Pughe's involvement in the conspiracy was the "sine qua non of venue" in the case.

---

[4] Section 4A1.1(e) has since been repealed and replaced with what was previously § 4A1.1(f). In referring to § 4A1.1(e) in this opinion, the Court refers to that section as it appeared at the time of Taylor's sentencing, prior to the November 2010 amendment.

14

(Petition at 27 (internal quotation marks omitted)).) Taylor suggests that this statement was erroneous, and that he was prejudiced by the statement because the Second Circuit relied on it in finding that venue existed in the Eastern District of New York.

Andino's statement in Taylor's reply brief did not constitute ineffective assistance of counsel because it represented an entirely accurate statement of the law. "[V]enue may lie in any district in which the conspiracy was formed or in any district in which a conspirator committed an overt act in furtherance of the criminal scheme." United States v. Rommy, 506 F.3d 108, 119 (2d Cir. 2007). Andino was correct in recognizing that the appropriateness of venue in this district turned on Pughe's involvement in the conspiracy. If the evidence was sufficient for a factfinder to determine by a preponderance of the evidence that Pughe was involved in the conspiracy and that he committed overt acts in furtherance of the conspiracy within this district, that would be enough to establish that venue was proper. Indeed, such was the exact rationale of the Second Circuit in finding Taylor's venue challenge meritless. See Pughe, 441 F. App'x at 779.

Even if Taylor's contention is construed to argue that Andino should not have conceded that Pughe's involvement was the key question, Andino's admission of that fact was not ineffective. Given the clear legal authority that a coconspirator's overt acts in furtherance of a conspiracy are sufficient to establish venue, it was entirely reasonable for Andino to concede that the decisive question was Pughe's involvement in the conspiracy, and not to raise the legal issue that Taylor apparently wishes to have raised—whether a coconspirator's act is sufficient to create venue at all. Furthermore, even if Andino should have raised that legal issue, the clear rule in the Second Circuit that the acts of a coconspirator may satisfy venue ensures that Andino's concession had no impact on the outcome of the appeal.

## F. Failure to Argue that North Carolina Conviction Was Not a Prior Felony

Taylor argues that his appellate counsel was ineffective for failing to file a letter pursuant to Fed. R. App. P. 28(j), or to otherwise amend his papers on appeal, to argue that the Fourth Circuit's decision in United States v. Simmons, 649 F.3d 237 (4th Cir. 2011) (en banc), applied to his case and rendered the application of the career offender enhancement erroneous. The defendant in Simmons was subject to a ten-year mandatory minimum under a federal statute raising the mandatory minimum for defendants convicted of a prior controlled substance offense punishable by more than one year imprisonment; the predicate conviction was a North Carolina marijuana conviction. Although Simmons was not sentenced to any prison time by the state court, the district court found that the conviction qualified as a predicate felony drug offense under 21 U.S.C. § 802(44) because, under North Carolina's statutory scheme, his maximum term of imprisonment would increase to more than twelve months had the state proven both certain aggravating factors and a certain level of criminal history. In the absence of those enhancements, however, the maximum term the state court could sentence Simmons to was eight months' community punishment, with no imprisonment. The Fourth Circuit reversed the district court's use of the North Carolina conviction to raise the mandatory minimum, holding that because North Carolina's statutory scheme was not a guidelines system, but instead mandated specific sentences—in that case, a sentence of less than twelve months—Simmons's North Carolina conviction was not "punishable by imprisonment for more than one year," and thus not a predicate crime that could increase the mandatory minimum. See Simmons, 649 F.3d at 243-50. Taylor argues that the Simmons decision should have been brought to the Second Circuit's attention, as his prior 1992 conviction, used to enhance his Guidelines range under the career offender provision, was also a North Carolina state conviction.

Taylor's counsel's failure to alert the Second Circuit to the Simmons decision did not qualify as ineffective assistance. Taylor's North Carolina conviction resulted in a sentence of five years' imprisonment. (See PSR ¶ 49.) Thus, even assuming the Second Circuit was to adopt the Simmons rationale, it would have been unnecessary for either this Court or the Second Circuit to conduct the Simmons analysis to determine what the maximum sentence was, as Taylor was actually sentenced to more than one year's imprisonment. Because a previous controlled substance conviction counts toward the career offender enhancement if it was "punishable by imprisonment for a term exceeding one year," U.S.S.G. § 4B1.2(b), the inclusion of Taylor's North Carolina conviction in determining him to be a career offender was correct, regardless of the Simmons decision.

### G. Failure to Raise "Recency Provision"

Finally, Taylor faults his counsel for failing to raise the U.S.S.G. § 4A1.1(e) "recency provision" at sentencing, and for failing to raise that provision's November 2010 repeal in his appellate papers. This claim largely reiterates his objections to the calculation of his criminal history points. See supra Part II.D. As discussed previously, the PSR correctly applied the § 4A1.1 criminal history calculation, and, in any event, that calculation did not matter, as the Court's determination that Taylor was subject to the career offender enhancement automatically resulted in a criminal history category of VI. For that same reason, the repeal of § 4A1.1(e) while his appeal was pending is irrelevant because that provision was not a factor in determining his Guidelines range.

## CONCLUSION

For the above reasons, Taylor's petition is denied in its entirety. Because there has been no "substantial showing of the denial of a constitutional right," a Certificate of Appealability

shall not issue. 28 U.S.C. § 2253(c). The Clerk of Court is directed to enter judgment and close the case.

Dated: Brooklyn, New York
     June 22, 2015

s/Carol Bagley Amon

Carol Bagley Amon
Chief United States District Judge